1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LANDON BYRON JACKSON,

Petitioner,                    No. CIV S-10-CV-0391 GEB CHS P

vs.

KELLY HARRINGTON,

Respondent.            <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

**1. INTRODUCTION**

Petitioner, Landon Byron Jackson, is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a cumulative sentence of fifty-four years and four months to life following his convictions by jury trial in the Sacramento County Superior Court, Case. No. 05F02532, for two counts of attempted murder with firearm and gang enhancements.[1]  Here, Petitioner presents various claims challenging the constitutionality of his convictions.

**II. CLAIMS**

_____

[1] Petitioner was tried in two separate trials.  The first trial resulted in a mistrial and he was retried and convicted in a second trial.

1

Petitioner presents several grounds for relief.  Specifically, the claims are as follow, verbatim:

> (1) The trial court abused its discretion prejudicially under *Gardeley* and Evidence Code section 352 by permitting Brown to testify to the substance of police reports recounting [his] alleged involvement in 5 uncharged crimes. [His] Sixth Amendment right to confrontation as interpreted by *Crawford* was violated.  If [his] trial counsel was required to specifically object on *Crawford* grounds then counsel's assistance was ineffective.
>
> (2) The record lacks substantial evidence to support the trial court's denial of [his] *Batson-Wheeler* motion.
>
> (3) The prosecutor committed prejudicial misconduct and violated [his] federal constitutional right to Due Process and a fair trial.  If [his] trial counsel's objections were insufficient, the counsel's assistance was ineffective.
>
> (4) Cumulative prejudice amounted to a violation of [his] right to Due Process.

Pet. at 6-7.

After careful consideration of the record and the applicable law, it is recommended that each of Petitioner's claims be denied..

## III. BACKGROUND

### A. FACTS

The basic facts of Petitioner's crimes were summarized in the unpublished opinion of the California Court of Appeal, Third Appellate District, as follows:

> At the conclusion of the first joint trial of defendant and his former girlfriend, Kaydee Wormington, two separate juries deadlocked. Both defendant and Wormington had testified, and that testimony was read to the jury during defendant's second trial.
>
> At the retrial, the only real issue was who shot at siblings Alicia and Ricky Canady on December 13, 2004, both of whom were standing in the driveway of William Jefferson's house. The basic story line is not disputed.  A group of friends, at least one of whom was a member of the Meadowview Bloods street gang and some of whom were smoking marijuana, were socializing in front of William Jefferson's

2

house.  A yellow Mustang, driven by a young white woman, stopped in front of the house.  A passenger asked, "Cuz where are you all from?"  After Ricky responded "this is Meadowview," the passenger shouted something like, "this is a Meadowview killer" and began shooting into the group.  Alicia was shot twice in the leg.

There were weaknesses in two of the identifications to be sure.  One of the two witnesses who identified defendant was high on marijuana at the time of the shooting and unable to identify the driver; the second was mentally impaired.  The third witness, one of the victims of the attempted murder and a Meadowview Blood, positively identified one of defendant's little "homeys," Corey Gaines, as the shooter and testified that defendant was not the person who opened fire on the day of the shooting.

Sixteen-year-old William Jefferson smoked three or four marijuana "blunts" a day and had smoked marijuana just before the shooting. The marijuana made him feel lazy and slowed him down.  He could not identify the color or length of the driver's hair, but he did see a bald-headed black male in the rear passenger seat behind the driver. He could not say if the shooter had any facial hair.  He told investigators the shooter's gun was black; at the first trial he said he was not sure if it was a semiautomatic or a revolver, and at the second trial he testified that it was a chrome semiautomatic.  During cross-examination, he refused to read any more of his prior testimony and had to be admonished that he did not have the liberty to choose what he wanted to look at.

Jefferson was not sure if he had been smoking before he was shown a photographic lineup.  He picked defendant out of the lineup two-and-a-half months after the shooting, and at trial he identified defendant as the shooter.  He claimed he had seen defendant once, maybe six months to a year before the shooting, when he was riding a bus and a friend of his had pointed defendant out.  He was unable to identify the driver.

The record is replete with references to Michael Morgan's limitations as a witness.  The prosecutor emphasized that there was a considerable lag in time between her asking him a question and his response.  The court gave her some leeway to lead her witness, over defense objection, because of Morgan's difficulty in understanding the questions.  He was easily confused and often contradicted either his earlier testimony or his answers in the first trial.  For example, he testified the Mustang was coming from one direction and later testified it came from the opposite direction.  He could not read maps. Yet he too identified defendant as the shooter, both in a photographic lineup and at trial.

Ricky Canady had disavowed his gang affiliation with the Bloods,

3

was married, attended community college full time, and was seeking work at the time of trial. Soon after the shooting, he spent the night with his girlfriend. That night, Corey Gaines, also knowing as P.K. for Piru Killer, spent the night at the same apartment. Canady, who was drunk, thought Gaines was the shooter. The next day they hung out together and Canady concluded, based on Gaines's [sic] behavior, that he must not have been the shooter after all. Two years later he changed his mind again and identified Gaines as the shooter. At trial, he insisted that defendant was not the man who shot at him.

Whatever the limitations of the testimony offered by Jefferson and Morgan that we might accept, we cannot discount the significance of the testimony offered by defendant's girlfriend and percipient witness, Kaydee Wormington. Wormington's testimony from the previous trial was read into the record after she asserted her Fifth Amendment right to remain silent at her second trial.

On December 12, 2004, Wormington and her father purchased a yellow Mustang with a manual transmission. Her father gave her instructions on how to operate a stick shift because she had never driven one before. The following day she picked up defendant and Corey Gaines in her yellow Mustang. Wormington testified that defendant told her to stop the car in front of a house with a group of African-Americans in the driveway. She complied.

She further testified that Corey Gaines and defendant got out of the car. It is unclear from her testimony if Gaines got completely out of the car, but it is clear that, according to Wormington, he was back in the car before she heard any shots. Defendant, however, was out of the car when she heard one of the males respond "Meadowview," and then she heard four or five shots and saw someone fall to the ground. During cross-examination, she stated that defendant shot the female victim.

Defendant jumped back into the car, yelling at her, "[B]itch, drive. Go. Go. Drive." She testified she stalled the car twice and then drove away. Defendant ultimately ordered her to get into the passenger seat and he then drove.

Wormington testified at some length how defendant had abused her and called her names like "bitch, slut, whore, [and] punk." He would slap, choke, and "man-handle" her. She explained she stopped the car our of fear of his reprisal if she disobeyed his order. She testified she wanted out of the relationship but conceded she continued to call him many times a day after the shooting. On one occasion over a month after the shooting, she picked him up at the hospital because he was crying and told her he needed her. She talked to him frequently even after her arrest. The prosecutor elicited testimony during cross-examination of Wormington that her allegations of

4

abuse were made only after she attended a domestic violence class in jail and belatedly admitted she was, in fact, with defendant at the time of the shooting.

Someone dropped a blue cell phone and left it at the scene of the crime. Kaylee Wormington was the subscriber for that phone. She testified she had given it to defendant as a birthday gift.

Defendant's testimony from the previous trial was also read back to the jury after he too invoked his right not to testify. Defendant admitted he did "hang with" and considered himself a member of the Valley Hi Crips. The prosecution introduced many photographs of defendant "throwing up" gang signs, dressed in blue, and accompanying other known gang members. Jefferson testified the shooter was wearing a blue do-rag, a blue beanie, and a blue jacket; Ricky Canady testified the shooter was wearing a blue do-rag and "all blue" clothing.

A gang expert testified to the customs and practices of African-American gangs in general and the Valley Hi Crips in particular. She explained, as gang experts customarily do, gang psychology and sociology, including such fundamentals as: Crips wear blue and utilize their left sides (e.g., an earring in the left ear), hand signs are the mark of group solidarity or challenge, a soldier in a gang is "someone who on a regular basis will put in work for the gang" and thereby attain status within the gang hierarchy, violence breeds fear and respect, daytime shootings are particularly effective for maintaining control in neighborhoods, and a Crip's reference to a Blood as "cuz" as well as the inquiry "where are you from?" are considered challenges.

The primary activities of the Valley Hi Crips, according to the expert, are homicides, attempted homicides, robberies, narcotics dealing, and stealing vehicles. The expert testified that in December 2004 the Meadowview Bloods and Valley Hi Crips were engaged in a gang war. She reported that defendant was a validated Crip gang member, and she believed he had attained status as a soldier for the Valley Hi Gangster Crips.[FN1] She opined that the shooting was for the benefit of the Valley Hi Gangster Crips, who would be given credit within the gang community for catching Meadowview Bloods "slipping," meaning they were caught without their guns. Defendant does not challenge any of the gang-related testimony of the expert, including the evidence of two predicate offenses committed by gang members and personally investigated by the expert.[2]

---

[2] Petitioner does, however, challenge the expert's hearsay based testimony regarding five incidents of uncharged prior misconduct in which Petitioner was allegedly involved. This claim is

1
2
FN1.   At times during the trial, counsel or witnesses referred to the Valley Hi Crips as the Valley Hi Gangster Crips.

3   Lodged Doc. 4 at 2-8.

4            Following his second jury trial, Petitioner was found guilty of the attempted murders

5   of Ricky and Alicia Canady, and the jury found true gang and firearm penalty enhancements as to

6   both crimes.  Petitioner was sentenced to an aggregate determinate term of twenty-nine years and

7   four months, plus a consecutive indeterminate term of twenty-five years to life.

8            Petitioner appealed his convictions to the California Court of Appeal, Third Appellate

9   District.  The court affirmed Petitioner's convictions with a reasoned opinion on February 11, 2009.

10   He then filed a petition for review of the appellate court's decision in the California Supreme Court.

11   The court denied the petition without comment on May 15, 2009.  Petitioner filed this federal

12   petition for writ of habeas corpus on February 16, 2010.  Respondent filed its answer on June 1,

13   2010, and Petitioner filed his traverse on June 24, 2010.

14                **IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW**

15            This case is governed by the provisions of the Antiterrorism and Effective Death

16   Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after

17   its enactment on April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114

18   F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a

19   person in custody under a judgment of a state court may be granted only for violations of the

20   Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362,

21   375 n. 7 (2000).  Federal habeas corpus relief is not available for any claim decided on the merits

22   in state court proceedings unless the state court's adjudication of the claim:

23                (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as
24

25   more thoroughly discussed in subsection V(A), below.

26                                                    6

1    determined by the Supreme Court of the United States; or

2    (2) resulted in a decision that was based on an unreasonable
     determination of the facts in light of the evidence presented in the
3    State court proceeding.

4    28 U.S.C. § 2254(d).  Although "AEDPA does not require a federal habeas court to adopt any one

5    methodology," there are certain principles which guide its application.  *Lockyer v. Andrade*, 538

6    U.S. 63, 71 (2003)

7           First, AEDPA establishes a "highly deferential standard for evaluating state-court

8    rulings."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  Accordingly, when determining whether

9    the law applied to a particular claim by a state court was contrary to or an unreasonable application

10   of "clearly established federal law," a federal court must review the last reasoned state court

11   decision.  *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911,

12   918 (9th Cir. 2002).  Provided that the state court adjudicated petitioner's claims on the merits, its

13   decision is entitled to deference, no matter how brief.  *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232

14   F.3d 1031, 1035 (9th Cir. 2000).  Conversely, when it is clear that a state court has not reached the

15   merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential

16   standard does not apply and a federal court must review the claim de novo.  *Nulph v. Cook*, 333 F.3d

17   1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

18          Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of

19   law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme

20   Court decisions."  *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381).  In other words,

21   "clearly established Federal law" will be " the governing legal principle or principles set forth by

22   [the U.S. Supreme] Court at the time a state court renders its decision."  *Lockyer*, 538 U.S. at 64.

23   It is appropriate, however, to examine lower court decisions when determining what law has been

24   "clearly established" by the Supreme Court and the reasonableness of a particular application of that

25   law.  *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

26                                              7

1    Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have

2  "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002).  Under the "contrary to" clause,

3  a federal court may grant a writ of habeas corpus only if the state court arrives at a conclusion

4  opposite to that reached by the Supreme Court on a question of law, or if the state court decides the

5  case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*,

6  529 U.S. at 405.  It is not necessary for the state court to cite or even to be aware of the controlling

7  federal authorities "so long as neither the reasoning nor the result of the state-court decision

8  contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).  Moreover, a state court opinion need not

9  contain "a formulary statement" of federal law, but the fair import of its conclusion must be

10  consistent with federal law.  *Id*.

11    Under the "unreasonable application" clause, the court may grant relief "if the state

12  court correctly identifies the governing legal principle...but unreasonably applies it to the facts of

13  the particular case." *Bell*, 535 U.S. at 694.  As the Supreme Court has emphasized, a court may not

14  issue the writ "simply because that court concludes in its independent judgment that the relevant

15  state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*,

16  529 U.S. at 410.  Thus, the focus is on "whether the state court's application of clearly established

17  federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

18    Finally, the petitioner bears the burden of demonstrating that the state court's

19  decision was either contrary to or an unreasonable application of federal law. *Woodford*, 537 U.S.

20  at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

21  ### V. DISCUSSION

22  **A.    EXPERT TESTIMONY REGARDING FIVE PRIOR UNCHARGED CRIMES**

23    Petitioner claims that the trial court abused its discretion under section 352 of the

24  California Penal Code and the criteria established in *People v. Gardley*, 14 Cal.4th 605 (1996), and

25  violated his right to confront the witnesses against him by allowing the prosecution's gang expert

26                                                    8

witness, Officer Wendy Brown, to testify that her expert opinion that Petitioner was a soldier in the

Valley Hi Crips street gang was based, in part, on Petitioner's alleged involvement in five uncharged

crimes.  Petitioner argues that testimony regarding the five uncharged crimes was irrelevant to the

charges he faced at trial and constituted inadmissible hearsay because it was derived from Brown's

review of police reports containing statements made to police by third-parties not subject to cross-

examination and not shown to be unavailable, in violation of his rights under the federal

Confrontation Clause.  Moreover, Petitioner contends that the testimony regarding the alleged prior

crimes committed by him was unreliable and its probative value was outweighed by the risk that the

jury would consider it as independent proof of the crimes alleged therein.  The California Court of

Appeal, Third Appellate District, described the background of Petitioner's claim and rejected it on

direct appeal, explaining as follows:

> Defendant does, however, challenge the expert's hearsay testimony regarding five incidents of prior uncharged misconduct in which he was allegedly involved.  The admissibility of the prior uncharged misconduct was hotly contested at trial.  In a lengthy pretrial brief, the prosecutor argued that defendant's past conduct "is relevant to his gang membership and more importantly, to issues of intent that the People must prove pursuant to PC 186.22(b)(1).  The enhancement places on the People the burden to prove that Jackson maintained the *specific intent to promote, further or assist the Crip[s] street gang when he committed his crime for the benefit of, at the discretion of, or in association with the gang.*"
>
> In the same brief and at the hearing on the admissibility of the evidence, the prosecutor expressed an expansive notion of the admissibility of otherwise inadmissible hearsay as a foundation for a gang expert's opinion.  Relying on *People v. Valdez* (1997) 58 Cal.App.4th 494, 506-507, she argued "the expert may recite otherwise inadmissible hearsay in open court, and the extent of such testimony is limited only by the discretion of the trial court, and reviewable only on an abuse of discretion standard."  The use of otherwise inadmissible police reports, she believed, was not an issue for the court and the damage could be remedied through cross-examination or instruction to the jurors that they were not to consider the evidence for the truth of the matters stated.
>
> At the hearing, the prosecutor went even further, proposing that there are special rules for the admissibility of otherwise inadmissible

hearsay in gang cases.  She argued, "I think that in many different areas of criminal law there are special rules.  In sex crimes, there's 1108.  Molest cases there are special rules of evidence. [¶] And in gangs we have the basic gang allegation, which really in effect opens the door regardless of -- whether a defense lawyer likes it or not, it places in issue the defendant's specific intent.  His motive behind why he commits the charged crime."

Again the prosecutor alluded to the special rules for gang cases. "[W]hen you read the cases, including *Gardeley*, they are really characterizing what comes in under gang expert as character evidence. [¶] . . . [¶] So I do think there are special rules and special applications when it comes to gangs that you don't see in a regular case when we are discussing 1101 evidence. [¶] . . . [Defense counsel] can say that I'm piling it on or trying to pile it on, but the bottom line is that I'm able to pile it on.  And I'm entitled to it, to pile it on under the law.  A law allows me to do that."

The court allowed the expert to testify at some length and in specific detail about each of five charges she obtained from various police reports.  The expert based her opinion that defendant was a soldier for the Valley Hi Gangster Crips, in part, on the five following allegations:

1.  On October 14, 2003, defendant allegedly was in the back seat of a car with other Valley Hi Crips.  He was wearing a blue shirt under a blue sweater with blue shoelaces and purportedly placed a handgun behind some salsa in a 7-Eleven store.  A loaded .45-caliber semiautomatic handgun was found in the car.  Defendant admitted that both guns were his and suggested he needed them for protection because "[y]ou never know what's gonna go on out here."

2.  On August 19, 2004, there was a drive-by shooting in the South Sacramento neighborhood of Meadowview, an area known as Blood territory.  The occupants of one of the cars, a black Honda Accord with flip-up lights, were wearing blue bandanas over their faces.  At least one of the victims was a Meadowview Blood.

3.  Six days later, defendant allegedly was driving the same black Honda.  The owner, one of defendant's girlfriends, purportedly said she had loaned the Honda to defendant on August 19.  Defendant abandoned the car and attempted to escape.  When apprehended, he allegedly told a police officer he was a former member of the Valley Hi Crips.  There was a fresh bullet hole in the trunk of the car.

4.  On November 24, 2004, occupants in two groups of cars were reported to be shooting at each other.  One of the cars was a white Chrysler Sebring.  Police officers, according to the report, found defendant's license, a cell phone, and registration papers naming

10

1    Kaydee Wormington as the owner.

2    5.   On February 21, 2005, Justin Starks was approached by three
     males later identified as Corey Gaines, Dimetric Mosely, and
3    defendant.   According to Starks, defendant recognized him and
     appeared initially hesitant to participate in the robbery, but when
4    Starks resisted Gaines's [sic] advance, defendant shot him twice in
     the back and accidentally shot Gaines as well.  Defendant purportedly
5    took Gaines to the hospital.

6    Defendant was not charged with any of these offenses.  The expert
     testified that these incidents supported her opinion that defendant was
7    soldier in the Valley Hi Gangster Crips because "[h]e is a person
     who's out there where handguns are involved, people are getting
8    shot" and he is "out with other gang members committing violent
     crimes."
9

10   . . . .

11   **Expert Testimony in the Prosecution of Street Terrorists**

12   To address the state of crisis caused by violent street gangs in
     California, the Legislature sought to eradicate criminal activity by
13   gangs, in part by enhancing gang members' sentences when their
     crimes are committed "for the benefit of, at the direction, or in
14   association with any criminal street gang with the specific intent to
     promote, further, or assist in any criminal conduct by gang
15   members." (Pen. Code, § 186.22, subd. (b) (1); see California Street
     Terrorism Enforcement and Prevention Act, Pen. Code, §§ 186.20 et
16   seq.)   Many jurors are unfamiliar with the intricacies of gang
     subcultures, including the meaning of their special vernacular, their
17   code of conduct, their symbols, their values, and their objectives.  As
     a result, the prosecution of gang members would be crippled without
18   expert testimony on such matters as the culture and habits of gangs
     (*People v. Ochoa* (2001) 26 Cal.4th 398, 438; *People v. Ferraez*
19   (2003) 112 Cal.App.4th 930-931) ; whether and how a crime was
     committed to benefit or promote a gang (*People v. Villegas* (2001) 92
20   Cal.App.4th   1217, 1227); rivalries between gangs (*People v.
     Williams* (1997) 16 Cal.4th 153, 192-193); gang-related tattoos, gang
21   graffiti, hand signs, and gang colors and attire (*Ochoa, supra,* 26
     Cal.4th at pp. 438-439; *People v. Loeun* (1997) 17 Cal.4th 1, 6-7);
22   and the primary activities of a specific gang (*People v. Gardeley*
     (1996) 14 Cal.4th 605, 620 (Gardeley)).

23   Evidence Code section 801 provides a vehicle for admitting gang
     expert opinion.  Pursuant to section 801, "[a]n expert may offer
24   opinion testimony if the subject is sufficiently beyond common
     experience that it would assist the trier of fact. [Citation.] The
25   opinion must be based on a matter perceived by, or personally

26                                11

1   known, or made known to the witness at or before the hearing that is
    of the type that reasonably may be relied on in forming an opinion on
2   the subject to which the expert's testimony relates." (*People v.
    Killebrew* (2002) 103 Ca.App.4th 644, 651 (*Killebrew*).) An expert
3   may offer an opinion in response to a hypothetical question based on
    facts shown by the evidence. (*In re Frank S.* (2006) 141 Cal.App.4th
4   1192, 1197.)

5   As noted above, the prosecution took an extremely expansive view
    of the admissibility of gang expert testimony under Evidence Code
6   section 801 and *Gardeley, supra,* 14 Cal.4th 605. Does *Gardeley,* as
    the prosecution argued, create a special rule of admissibility for
7   hearsay evidence of a gang member's prior acts of uncharged
    misconduct as long as that evidence is introduced as a basis for an
8   expert opinion and, as the trial court believed, it appears reliable?
    Though we conclude that any error was harmless, we reject this
9   interpretation of *Gardeley.*

10  In *Gardeley*, the Supreme Court upheld the admissibility of a gang
    expert's opinion, including his testimony recounting hearsay.
11  "Expert testimony may also be premised on material that is not
    admitted into evidence so long as it is material of a type that is
12  reasonably relied upon by experts in the particular field in forming
    their opinions. [Citations.] Of course, any material that forms the
13  basis of an expert's opinion testimony must be reliable. [Citation.]
    For 'the law does not accord to the expert's opinion the same degree
14  of credence of integrity as it does the data underlying the opinion.
    Like a house built on sand, the expert's opinion is no better than the
15  facts on which it is based.' [Citation.] [¶] So long as this threshold
    requirement of reliability is satisfied, even matter that is ordinarily
16  *inadmissible* can form the proper basis for an expert's opinion
    testimony." (*Gardeley, supra,* 14 Cal.4th at p. 618.)

17
    The trial court, like the court in *Killebrew*, believed that *Gardeley*
18  compelled the admission of the five incidents of uncharged
    misconduct because, in the court's estimation, the hearsay met the
19  threshold test of reliability. (*Killebrew*, *supra,* 103 Cal.App.4th at pp.
    652-653.)[FN2] But admission of the evidence was not compelled. The
20  trial court overlooked the Supreme Court's admonition to exercise its
    discretion "'to weigh the probative value of inadmissible evidence
21  relied upon by an expert witness . . . against the risk that the jury
    might improperly consider it as independent proof of the facts recited
22  therein.' (*People v. Coleman* (1985) 38 Cal.3d 69, 91 . . . . ) This is
    because a witness's [sic] on-the-record recitation of sources relied on
23  for an expert opinion does not transform inadmissible matter into
    'independent proof' of any fact." (*Gardeley, supra,* 14 Cal.4th at p.
24  619.)

25      FN2.   In light of our disposition, we need not address

26                              12

whether admission of the hearsay evidence violated defendant's right to confrontation as that right has been clarified by the Supreme Court in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177].

Thus, we reject the prosecution's notion that *Gardeley* creates a special rule of admissibility for the admission of a gang expert's testimony. The prosecution's analogies to Evidence Code section 1108 and child molestation cases are inapt because the Legislature in those cases created an express exception to allow the admission of otherwise inadmissible evidence. The prosecutor has pointed to no comparable statute allowing gang expert opinion whether or not the evidence is inflammatory, unduly prejudicial, necessary, or cumulative. Nor does *Gardeley* condone the admission of hearsay that, under the circumstances presented, effectively transforms inadmissible matter into independent proof of any fact. Rather, *Gardelely* reaffirms the long-standing principle that a trial court must exercise its discretion to assure that a gang expert does not become a mere conduit for inadmissible and extraordinarily prejudicial hearsay.

There is no doubt that hearsay evidence about gangs is admissible to buttress a gang expert's opinion that the crime is "gang-related" or committed to "benefit" the gang. However, here the contested evidence is not about the gang, but about defendant. And the evidence is not merely about defendant's membership in the gang, association with gang members, or conformity with gang customs, but about five specific incidents of uncharged misconduct. The hearsay was relied on by the prosecution not to prove the shooting was "gang-related" or to "benefit" the gang, but as evidence of defendant's specific intent.

Notwithstanding limiting instructions by the court, there is a danger that gang-related propensity evidence of uncharged misconduct will reflect a defendant's bad character and jurors will infer that he would have been more likely to commit the charged offense. Evidence Code section 1101 bars admission of such propensity evidence unless it is admitted to prove intent, identity, motive, etc. Defense counsel urged the prosecutor to clarify whether she was seeking admission of the evidence based on section 1101. He pointed out, "that would have to come from evidentiary sources that are properly admissible and not multiple layers of hearsay through an expert."

The prosecutor pointed out that in the first trial she did not "establish or use per say [*sic*] 1101. We used primarily information -- detailed information from Wendy Brown as a basis for opinion." This was a prelude to her explanation of the special rule of evidence in gang cases. She later argued, "when you read the cases, including *Gardeley*, they are really characterizing what comes in under a gang

13

expert as character evidence," and she repeated her understanding that "there are special rules and special applications when it comes to the gangs that you don't see in a regular case when we are discussing 1101 evidence."

The prosecutor could not have been more wrong.  The Supreme Court has been unrestrained in its condemnation of admitting evidence of uncharged misconduct to show criminal propensity except under the narrowly defined circumstances set forth in the evidence code.  (See Evid. Code, §§ 1101, 1108.)  In *People v. Smallwood* (1986) 42 Cal.3d 415 (*Smallwood*),[FN3] for example, the court wrote: "The harm which flows from allowing the jury to hear evidence of other crimes is too well known to require much restatement.  In *People v. Thompson* (1980) 27 Cal.3d 303 . . . , this court rigorously enforced the rule that evidence of other crimes may never be admitted to show the accused's criminal propensity."  (*Smallwood*, at p. 428.)  The court reiterated the rationale for this rule: "'"The primary reasoning that underlies this basic rule of exclusion is not the unreasonable nature of the forbidden chain of reasoning. [Citation.] Rather, it is the insubstantial nature of the inference as compared to the 'grave danger of prejudice' to an accused when evidence of an uncharged offense is given to a jury. [Citations.] As Wigmore notes, admission of this evidence produces an 'over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts.' [Citation.] It breeds a 'tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offenses . . . .'"'" (*Ibid.*)

> FN3.   *Smallwood* predates the enactment of Evidence Code section 1108 in 1995.  (Stats. 1995, ch. 439, § 2.)

Gang evidence itself is similarly dangerous.  "California courts have long recognized the potentially prejudicial effect of gang membership . . . . [¶] Thus, as a general rule, evidence of gang membership and activity is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative." (*People v. Albarran* (2007) 149 Cla.App.4th 214, 223.)  Here, of course, gang evidence was relevant to proving the gang enhancement.  But when that evidence involved not only evidence related to the customs and habits of gangs, and not only defendant's affiliation with the gang in question, but unproven and uncharged allegations that he committed specific gang-related crimes in the past, the court erred by failing to exercise its discretion to weigh the highly inflammatory and prejudicial impact on the jury.

Defendant insists the probative value of the expert testimony was weak and cumulative.  The Attorney General disagrees and posits that, in any event, the risk of prejudice was ameliorated by the court's

limiting instruction to the jurors wherein they were admonished not to consider the hearsay evidence for the truth of the matter asserted, but only to evaluate the basis upon which the expert's testimony was based.   We need not resolve this dispute because any error in admitting the expert testimony was clearly harmless under the standard of review applicable to this case given the overwhelming evidence of defendant's guilt.

**Prejudice**

Defendant claims the erroneous admission of the hearsay evidence of his uncharged misconduct was so serious as to render his trial fundamentally unfair and thereby violate his federal constitutional right to due process.   We disagree.

"To prove a deprivation of federal due process rights, [defendant] must satisfy a high constitutional standard to show that erroneous admission of evidence resulted in an unfair trial.   (*Albarran, supra,* 149 Cal.App.4th at p. 229.)   "The admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair."   (*People v. Falsetta* (1999) 21 Cal.4th 428, 439.)   "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."   (*Kyles v. Whitely* (1995) 514 U.S. 419, 434 [131 L.Ed.2d 290].)[3]

But even if defendant persuaded us the admission of the evidence violated the due process requirement, we find the error harmless. Constitutional violations are subject to federal harmless-error analysis under *Chapman, supra,* 386 U.S. at p. 24.   "'[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' [Citation.] The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' [Citation.]"   (*People v. Geier* (2007) 41 Cal.4th 555, 608.)

---

[3] The state appellate court's citation to *Kyles* is not factually on point because that case involved a prosecutor's failure to disclose favorable evidence to a criminal defendant instead of a court's erroneous admission of evidence.  Despite the factual dissimilarities, the prejudice standard set forth in *Kyles* is not inconsistent with the standards discussed, below, for determining whether a defendant has been prejudiced by the erroneous admission of evidence and, thus, has suffered a federal due process violation.  *See, e.g., Williams v. Taylor*, 529 U.S. 362, 375 (2000) (relief should be granted where an error of constitutional magnitude has rendered a trial fundamentally unfair in violation of due process).

15

After carefully reviewing the entire record, we find the error harmless under the *Chapman* standard.  The evidence that defendant was the shooter was compelling.  Eyewitnesses Jefferson and Morgan, albeit with their limitations as percipient witnesses fully exposed during their cross-examination, both identified defendant as the shooter. Jefferson saw a yellow Mustang trying to leave, and heard the clutch trying to engage, after a bald-headed black male got into the rear driver's side.  After two attempts, the driver of the Mustang was able to engage the clutch and left the scene rapidly, "[b]urning rubber." Defendant's girlfriend, Kaydee Wormington, owned a yellow Mustang.  She admitted she stalled the car twice before leaving the scene.

Most damning was Wormington's testimony.  The jury heard her testimony from the first trial that she saw defendant get out of the Mustang and approach a group of African-Americans, and heard him ask where they were from.  A heavyset African-American male responded, "Meadowview," and she heard gunshots and saw someone fall to the ground.  Defendant jumped back into the car, yelling "bitch, drive."  Wormington stalled the car.  She testified she finally got the car started, drove to the end of the street, and stalled the car again.  Defendant then told Wormington to get in the passenger seat, and he got out of the car, went around to the driver's seat, and drove off.

In addition to three eyewitness identifications, someone dropped a blue cell phone at the scene of the shooting, and defendant admitted Wormington had given him the phone as a gift.

We recognize one of the victims, Ricky Canady, identified Corey Gaines as the shooter, and defendant testified that on the day of the shooting, he told Wormington to take Gaines out in her yellow Mustang.  But Canady did not identify Gaines until two years after the shooting.   Until then, he refused to cooperate with the investigation.  We do not believe his belated identification was credible enough to overshadow the other three eyewitness identifications, including, most importantly, Wormington's testimony that defendant fired four or five shots at the group of people standing on the driveway.

On this record, we conclude defendant would not have obtained a more favorable verdict in the absence of the evidentiary error.  As we have repeated throughout this opinion, his participation in the gang was undisputed.  The erroneously admitted evidence of gang-related misconduct reinforced his image as a gangster, but it was not unlike his own admissions and the photographs of him as an active participant in gang life.  Moreover, the jury was appropriately admonished not to consider evidence for the truth of the alleged misconduct, and we presume the jury followed the court's

16

instructions.  (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1326.)  In sum, the positive identification by three witnesses, coupled with evidence that defendant left his phone at the scene, renders it clear beyond a reasonable doubt that the jury would not have acquitted defendant even if the prior misconduct evidence had not been admitted.

Lodged Doc. 4 at 8-21.

The question of whether evidence of prior uncharged acts was properly admitted under either *Gardeley* or section 352 of the California Evidence Code is not cognizable in this federal habeas corpus proceeding because federal habeas corpus relief is generally not available to correct alleged errors in the application or interpretation of state law or procedure.  *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  "State court rulings on the admissibility of evidence generally fall outside the scope of federal habeas relief, which is designed only to remedy violations of federal law."  *Winzer v. Hall*, 494 F.3d 1192, 1198 (9th Cir. 2007).  The only question before this court, therefore, is whether the trial court committed an error that rendered the trial so arbitrary and fundamentally unfair that it violated federal due process.  *Id. See also Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) ("[T]he issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point.").

To the extent that Petitioner's claim is grounded generally in a violation of his federal due process rights, the United States Supreme Court has held that habeas corpus relief should be granted where constitutional errors have rendered a trial fundamentally unfair.  *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  No Supreme Court precedent has made clear, however, that admission of irrelevant or overly prejudicial evidence can constitute a due process violation warranting habeas corpus relief.  *See Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) ("The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant

17

1  or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of

2  the writ." (citation omitted)).  Nor has the United States Supreme Court "expressly held that it

3  violates due process to admit other crimes evidence for the purpose of showing conduct in

4  conformity therewith, or that it violates due process to admit other crimes evidence for other

5  purposes without an instruction limiting the jury's consideration of the evidence to such purposes."

6  *Garceau v. Woodford*, 275 F.3d 769, 774 (9th Cir. 2001).  In fact, the Court has expressly left open

7  this question.  *See Estelle*, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no

8  opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior

9  crimes' evidence to show propensity to commit a charged crime.").  Accordingly, Petitioner has

10  failed to demonstrate that the state appellate court's rejection of his federal due process claim was

11  contrary to or an unreasonable application of clearly established federal law.   28 U.S.C. §

12  2254(d)(1).  *See also Alberni v. McDaniel*, 458 F.3d 860, 863-67 (9th Cir. 2006) (denying the

13  petitioner's claim that the introduction of propensity evidence violated his due process rights under

14  the Fourteenth Amendment because "the right [petitioner] asserts has not been clearly established

15  by the Supreme Court, as required by AEDPA"); *Holgerson v. Knowles*, 309 F.3d 1200, 1202 (9th

16  Cir. 2002) (habeas corpus relief not warranted unless due process violation was "clearly established"

17  under federal law; *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001) (same).

18          Further, even assuming the testimony was admitted in error, the testimony did not

19  have a "substantial and injurious effect of influence in determining the jury's verdict."  *Brecht v.*

20  *Abrahamson*, 507 U.S. 619, 637 (1993).  As noted by the state appellate court, any threat of

21  improper prejudice flowing from admission of evidence of prior uncharged acts was mitigated by

22  the trial court's instruction directing the jury to consider the evidence only "for the limited purpose

23  of showing the information upon which the gang expert based her opinion . . . [and] not to be

24  considered . . . as evidence of the truth of the facts disclosed by those statements."  CT at 1101.  The

25  jury in Petitioner's case is presumed to have followed this instruction.  *Old Chief v. United States*,

26                                            18

519 U.S. 172, 196-97 (1997); *United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998).

In addition, to the extent Petitioner's claim bases his claim on a violation of the Confrontation Clause, he has also failed to demonstrate that he is entitled to federal habeas corpus relief. The Confrontation Clause of the Sixth Amendment, made applicable to the states through the Due Process Clause of the Fourteenth Amendment, requires that a criminal defendant be afforded the right to confront and cross-examine witnesses against him. *See Pointer v. Texas*, 380 U.S. 400, 403 (1965). In 2004, the United States Supreme Court held that the Sixth Amendment's Confrontation Clause is violated when testimonial hearsay evidence is admitted under circumstances where the criminal defendant had no opportunity to conduct a cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68 (2004). The Court rejected such statements as exceptions to the Confrontation Clause, regardless of their demonstrated reliability, on the grounds that "dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Id*. at 62. While the *Crawford* Court specifically left "for another day any effort to spell out a comprehensive definition of 'testimonial,'" it gave examples. "Whatever else the term covers, it applies at minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id*. at 68.

Subsequently, the Supreme Court held that the core class of testimonial statements covered by the Confrontation Clause includes affidavits or declarations, made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, because such affidavits are "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" *Melendez-Diaz v. Massachussetts*, 129 S.Ct. 2527, 2532 (2009) (quoting *Davis v. Washington*, 547 U.S. 813, 830 (2006). On the other hand, "it is undisputed that public records, such as judgments, are not themselves testimonial in nature and that these records do not fall within the prohibition established by the Supreme Court in

1   *Crawford*." *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) (finding non-testimonial

2   various public records including fingerprints, a photograph, and records of conviction); *Melendez-*

3   *Diaz*, 129 S.Ct. at 2538 ("Documents kept in the regular course of business [are non-testimonial]

4   and may ordinarily be admitted at trial despite their hearsay status.").

5           Assuming for the purposes of this report that the admission of the gang expert's

6   testimony regarding prior uncharged crimes constituted improper testimonial hearsay evidence,

7   Petitioner is still not entitled to federal habeas corpus relief on this claim.  On federal habeas corpus

8   review, Confrontation Clause violations are subject to harmless error review.  *Winzer v. Hall*, 494

9   F.3d 1192, 1201 (9th Cir. 2007) ("Violation of the Confrontation Clause is trial error subject to

10  harmless-error analysis . . . because its effect can be 'quantitatively assessed in the context of other

11  evidence presented' to the jury.");  *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004).

12  Habeas corpus relief may not be granted based on a Confrontation Clause violation unless admission

13  of the offending evidence had a substantial and injurious effect or influence in determining the jury's

14  verdict, and only if the petitioner can establish actual prejudice.  *Hernandez v. Small*, 282 F.3d 1132,

15  1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  *See also Lilly v.*

16  *Virginia*, 527 U.S. 116, 139-140 (1999) (harmless error analysis applies to erroneous admission of

17  hearsay statements); *Christian v. Rhode*, 41 F.3d 461, 468 (9th Cir. 1994) (harmless error analysis

18  applies to alleged violations of the Confrontation Clause).

19          On the record in this case, any error in admission of the expert's testimony regarding

20  prior uncharged crimes was harmless because introduction of the expert's testimony did not render

21  his trial fundamentally unfair and did not have a substantial or injurious effect on the jury's verdict.

22  As the state appellate court explained, evidence of Petitioner's guilt was substantial, and that court's

23  evaluation of the evidence presented against Petitioner at trial, as quoted above, is fully supported

24  by the record.  Three eyewitnesses, including Petitioner's own girlfriend,  identified him as the

25  shooter and described the specifics of the shooting consistently.  Petitioner's girlfriend also admitted

26                                      20

1  driving the yellow Mustang which was described by witnesses as the vehicle in which the shooter

2  was riding.  A blue cell phone was found at the scene of the shooting and Petitioner's girlfriend

3  testified that she had given it to Petitioner, and Petitioner identified it as the phone she had given to

4  him.  Moreover, while admission of evidence of prior uncharged acts may have emphasized

5  Petitioner's participation in the Valley Hi Crips, Petitioner's own testimony and photographs of him

6  flashing gang signs had the same effect.  The state court opinion rejecting Petitioner's argument is

7  a reasonable construction of the evidence in this case and is not contrary to or an objectively

8  unreasonable application of clearly established federal law.  *See Woodford v. Visciotti*, 537 U.S. 19,

9  25 (2002); 28 U.S.C. § 2254(d)(1).

10              Petitioner is not entitled to federal habeas corpus relief on this claim.

11  **B.      TRIAL COURT'S DENIAL OF THE *BATSON-WHEELER* MOTION**

12              Petitioner claims that the evidentiary record does not support the trial court's denial

13  of his *Batson-Wheeler* motion, which challenged the prosecutor's use of a peremptory challenge to

14  excuse prospective juror no. 11, Ms. Craig, a prospective juror of African-American ancestry.  The

15  California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim on

16  direct appeal, explaining as follows:

17              Defendant contends he was denied his federal constitutional right to
             equal protection (*Batson v. Kentucky* (1986) 476 U.S. 79, 89 [90
18              L.Ed. 69] (*Batson*)) and his state constitutional right to a trial by a
             jury drawn from a representative cross-section of the community
19              (*People v. Wheeler* (1978) 22 Cal.3d 258, 265-266 (*Wheeler*)) when
             the prosecutor exercised a peremptory challenge to excuse an
20              African-American woman from the jury venire.  We reject his claim.

21              "The *Batson* three-step inquiry is well established.  First, the trial
             court must determine whether the defendant has made a prima facie
22              showing that the prosecutor exercised a peremptory challenge based
             on race.  Second, if the showing is made, the burden shifts to the
23              prosecutor to demonstrate that the challenges were exercised for a
             race-neutral reason.    Third, the court determines whether the
24              defendant has proven purposeful discrimination. The ultimate burden
             of persuasion regarding racial motivation rests with, and never shifts
25              from, the opponent of the strike. [Citation.] The three-step procedure

26                                          21

also applies to state constitutional claims." (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613 (*Lenix*).)

Here the trial court ruled that the exercise of the peremptory challenge to the sole African-American on the venire established a prima facie case.   As a result, the prosecutor offered three permissible, race-neutral bases for the challenge.   The prosecutor explained: "I have three grounds that cause me concern with Ms. [C.].   And, actually, they were asked -- that I really ponder with this particular juror because she appeared to be a conservative.   She appeared visually to me to be a conservative lady.   She has a good job, and she has no children.   I thought that might be a plus, and, actually, there wouldn't be any baggage.

"But the thing that caused me concern were [*sic*] her feelings.   She initially said that she had strong feelings about the juror system, the criminal system and initially went into how the system didn't work.   She was rehabilitated to a certain extent by the Court, certainly enough to get over a cause challenge.   But what I heard from her is, she served on a panel, apparently not -- Reached a verdict, which must have been not guilty, which caused her some concern because she felt that the person was probably guilty -- That the prosecutor had not proven their case, she stated.

"And the bottom line was, she felt that -- These are her words -- 'Innocent people in jail' and some 'guilty people on the street'.

"The 'guilty people on the street' didn't affect me too much, but the 'innocent people in jail' caused me concern because in a non-guilty verdict, a red flag goes up in my mind, in the application of reasonable doubt.

"In the particular case, I wouldn't want misapplication to be applied and have her go back to those strong feelings of that -- That Mr. Jackson would be one of those innocent people in jail.

"Something else that caused me concern was that her nephew was prosecuted in Sacramento County, in what I would consider a remote time ago, in a fraud arrest.   It was three, four years ago.

"And the last thing that caused me quite a bit of concern was that she had a partner -- Her current partner was prosecuted in a D.V., domestic-violence case, two years ago.   This is even more recent than her nephew.   It was in San Joaquin County.

"This person I'm not sure, male or female, but this person was prosecuted, and she felt from that, and from her guilty plea, that there was no opportunity for both sides to present their case.

"That, to me, is a very, very defense-oriented statement in itself.

"In the particular case, I am working with [defense counsel] regarding Miss Wormington's transcript. At least the Court has some indication of some of the subjects raised in that transcript. Although a lot of the detail value of Miss Wormington's domestic-violence allegation are [sic] probably not going to be included in a read-back, I feel that there is at least the framework of the D.V. defense that she brought in in the first trial that will not be stricken by this Court, because she was absolutely cross-examined on it by [defense counse.].

"Because of that, there is an issue as to how this woman would feel about another woman making allegations that involve concerns about domestic violence.

"So, I mean, with all that, I felt comfortable, very comfortable in that."

Once the race-neutral explanation is offered, "the trial court must determine whether the opponent of the strike has proved purposeful racial discrimination." (*People v. Fiu* (2008) 165 Cal.App.4th 360, 391 (*Fiu*).) "At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proferred rationale has some basis in accepted trial strategy.' [Citation; fn. omitted.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office who employs him or her." (*Lenix*, *supra*, 44 Cal.4th at p. 613.)

The trial court made a "sincere and reasoned effort to evaluate the prosecutor's explanations for her excusal of the prospective juror [ ]." (*People v. Jordan* (2006) 146 Cal.App.4th 232, 246.) The trial court explained, at some length: "Counsel is allowed to use the totality of the circumstances, including the fact that counsel has challenged other similarly situated members of the majority group on an identical or comparable ground. So, essentially, that's what you have here.

"You know, one of the things that [the prosecutor] hangs her hat on is the fact that the affected juror, the juror in question, Miss [C.], had indicated, quite clearly, that, you know, that she felt the person during her prior jury service was guilty. But the jury did reach a not-guilty verdict based on the law, and she did indicate that she had a problem with that.

23

"In fact, she went further by stating that there were innocent people in jail and guilty people on the street.  And, yes, I did try to rehabilitate her, and I do think that if counsel had made a motion for cause to exclude her, I would have denied such a motion.

"But I am -- I do find it relevant that, based on that reason alone -- And [the prosecutor] actually challenged other similarly situated members of the majority group -- In other words, of Caucasian [sic], because, let's face it, the majority of the jurors that we have here today, even the ones in the box, the majority of the jurors are Caucasian, and she did challenge them on identical or comparable grounds.

"In fact, I recollect that, Miss. [A. P.] having some sentiments, but certainly Miss [R.] was clearly there.  I mean, she said -- there was another juror who said it, 'and I'm just like her'.  And when I referenced Miss [C.], and I talked about gut feelings about guilt or innocence, then she indicated, yes, that was the conversation.

"And I will note -- And the reason I brought that up is because I will note that [the prosecutor] did exclude, did exclude [P.] -- Actually, her name is [P.A.].  (Sic)

"She did exclude Miss [A.], and she also did exclude [N. R.].  So if one were to look at this objectively she essentially excluded two members --

"Oh, let me say this.  Miss [R.] did not appear to be Caucasian, though; she actually appeared to me to be either Japanese or Korean, although her name certainly is not a Japanese surname nor a Korean surname.  But I do find that Miss [P.] -- Miss [A.] certainly was Caucasian.  And she was excluded for that reason.

"And you know, quite frankly, that is a non-discriminatory justification.  And I think it's an accurate justification, as well, you know, based on the affected jurors' responses to the question.

"And also, you know, she did have some involvement with the justice system, via her nephew and via her partner that, you know, it was pretty clear that she was not satisfied with the outcome of at least the domestic-violence case.  But she did indicate she could set it aside and be fair and impartial to both sides.

"But I do find that the prosecution has offered non-discriminatory justification in all -- In three of these instances, first of all, the feelings about the justice system, i.e., reaching a not-guilty verdict and feeling that the defendant was guilty.

"Her nephew was prosecuted in Sacramento three or four years ago

24

presumably by the very same office that [the prosecutor] worked for, and she had a partner in the DV case two years ago in San Joaquin, and she was not satisfied with the outcome.

"So I do find that there was a -- I do find that there are non-discriminatory justifications.  So I do find at this time that the *Wheeler/Batson* motion must fail, and so it is denied."

Given the trial court's sincere and reasoned effort to evaluate the merits of the prosecutor's explanations, we give deference to the court's ability to distinguish "'bona fide reasons from sham excuses'" and review the ruling on "purposeful racial discrimination for substantial evidence." (*Fiu, supra,* 165 Cal.App.4th 415, 469.)

Defendant urges us to conduct a comparative analysis to evaluate whether the prosecutor's stated reasons for exercising a peremptory challenge are truthful or pretextual.  "Comparative juror analysis is evidence that, while subject to inherent limitations, must be considered when reviewing claims of error at *Wheeler/Batson*'s third state when the defendant relies on such evidence and the record is adequate to permit the comparisons." (*Lenix, supra*, 44 Cal.4th at p. 607.) Defendant's argument notwithstanding, a comparative analysis supports the trial court's ruling.

The prosecutor excused three jurors who had expressed dissatisfaction with the criminal justice system.  Skepticism about the fairness of the criminal system is a valid ground for excusing a juror. (*People v. Gray* (2005) 37 Cal.4th 168, 192; *people v. Calvin* (2008) 159 Cal.App.4th 1377, 1386.)  Juror [C.] was the most empathetic. She expressed her disappointment with the criminal justice system on multiple occasions, including her prior jury service and her partner's recent experience.  She believed that many innocent people were incarcerated while the guilty went free.  She expressed her regret that, as a juror, she was compelled to acquit a defendant, even though in her gut she believed him to be guilty.  The prosecutor was justifiably reluctant to have such a skeptic on the jury.

Two other jurors were excused for the same reason.  Juror [P.] had a similar experience as a juror wherein "the burden of proof was not proven" and the defendant was acquitted.  Similarly, Juror [R.], who had served as a juror in a battery case, had a "gut feeling" that the defendant was guilty, but based "on evidence and the testimony," the jury acquitted.  In all three cases, the prosecutor excused prospective jurors who gave tangible evidence of their disappointment in the criminal justice system.  It was their unpleasant or unsatisfactory experiences, rather than any racial prejudice, that motivated the prosecutor to dismiss them.

Defendant now minimizes the significance of this factor, however,

and emphasizes that Jurors [C.] and [P.], like two other jurors, had relatives who had been prosecuted.  Because the prosecutor did not excuse either of the two other jurors, defendant argues the prosecutor's exercise of a peremptory challenge to Juror [C.] was racially motivated.  Not so.  Defendant's selective use of some, but not all, of the factors affecting the wisdom of choosing particular jurors highlights the inherent limitations of a comparative analysis. While it is true that jurors who were not excused had relatives who had been prosecuted, as did Juror [C.], neither of them expressed dissatisfaction or skepticism about the fairness of the criminal justice system.  But Juror [C.]'s blunt indictment that "I just felt like when we finished, the system really hadn't worked" provided an adequate racially neutral justification for excusing her.

In sum, the prosecutor offered credible race-neutral explanations for challenging Juror [C.], who happened to be African-American.  The trial court carefully evaluated those explanations and considered how the prosecutor had used the same criteria to evaluate other jurors as well.  Thus, the trial court's ruling is entitled to deference and its factual finding that the challenge was not racially motivated is supported by substantial evidence.  We find no *Batson/Wheeler* error.

Lodged Doc. 4 at 21-30.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the United States Supreme Court held that the Equal Protection Clause prohibits a prosecutor from exercising peremptory challenges to strike a venire person on the basis of race.  *People v. Wheeler*, 22 Cal.3d 148 (1978) is the California state counterpart to *Batson*.  *Yee v. Duncan*, 463 F.3d 893, 896 (9th Cir. 2006).  However, it is the standards of *Batson* that control the disposition of Petitioner's claim on federal habeas corpus review.  *Lewis v. Lewis*, 321 F.3d 824, 827 (9th Cir. 2003).

In order to prevail on a *Batson* claim, a defendant must first establish a prima facie case of purposeful discrimination.  *Batson*, 476 U.S. at 96-97; *Lewis*, 321 F.3d at 830; *United States v. DeGross*, 960 F.2d 1433, 1442 (9th Cir. 1992).  "To establish a prima facie case, the defendant must show that 'he is a member of a cognizable racial group,' *Batson*, 476 U.S. at 96, and that 'the facts and circumstances of the case raise an inference' that the prosecution has excluded venire members from the petit jury on account of their race."  *McClain v. Prunty*, 217 F.3d 1209, 1219-20 (9th Cir. 2000) (quoting *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000)).  In deciding

26

whether a defendant has made the requisite showing, the trial court should consider all relevant circumstances. *Batson*, 476 U.S. at 96.

If a prima facie case is made out, "the burden shifts to the State to come forward with a neutral explanation for challenging" the jurors in question. *Batson*, 476 U.S. at 97; *DeGross*, 960 F.2d at 1442; *Stubbs*, 189 F.3d at 1104. "The prosecutor's challenges need not rise to a level justifying use of a challenge for cause." *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (citing *Batson*, 476 U.S. at 87-88). Indeed, for the purposes of this step the prosecutor's explanation need not be "persuasive or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Rather, a neutral explanation in this context "means an explanation based on something other than the race of the juror." *McClain*, 217 F.3d at 1220 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)). "At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *McClain*, 217 F.3d at 1220 (quoting *Stubbs*, 189 F.3d at 1105). As with any credibility determination, the trial court's own observations are of significant importance. *Batson*, 476 U.S. at 98, n.21. *See also Lewis*, 321 F.3d at 830.

At the final step of this inquiry, "the trial court must determine whether the defendant has carried the burden of proving purposeful discrimination." *McClain*, 217 F.3d at 1220 (quoting *Hernandez*, 500 U.S. at 359). *See also Batson*, 476 U.S. at 98. The court must evaluate the prosecutor's reasons and make a credibility determination. *Lewis,* 321 F.3d at 830. A comparative analysis of the struck juror with empaneled jurors "is a well-established tool for exploring the possibility that facially race-neutral reasons are a pretext for discrimination." *Lewis*, 321 F.3d at 830. If a review of the record undermines the prosecutor's stated reasons, or many of the stated reasons, then the explanation may be deemed a pretext. *Id*. The proffer of various faulty reasons and only one or two otherwise adequate reasons may undermine the prosecutor's credibility to such an extant that a court should sustain a *Batson* challenge. *Id*. at 831.

On the other hand, "[t]he fact that a prosecutor's reasons may be 'founded on nothing more than a trial lawyer's instincts about a prospective juror' does not diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions." *Power*, 881 F.2d at 740 (quoting *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)). "Evidence in the record of objective reasons to strike a juror implies that racial bias did not motivate the prosecutor." *Boyd v. Newland*, 393 F.3d 1008, 1013 (9th Cir. 1987).

Petitioner bears the burden of demonstrating the existence of unlawful discrimination, *Batson*, 476 U.S. at 93, as this burden of persuasion "rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768. However, Petitioner "is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" *Batson*, 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559, 662 (1953)).

A state court's finding that a prosecutor has not exhibited discriminatory intent in exercising peremptory challenges "represents a finding of fact of the sort accorded a great degree of deference." *Hernandez*, 500 U.S. at 364. Thus, in order for Petitioner to obtain habeas corpus relief "[u]nder AEDPA, . . . a federal habeas court must find the state-court conclusion 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Rice v. Collins*, 546 U.S. 333, 338 (2006) (quoting 28 U.S.C. § 2254(d)). "[A] federal habeas court can only grant [habeas corpus relief] if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Id*. In determining whether a state court's application of law or factual determination is "unreasonable," the court cannot simply consider whether it would have reached a different outcome on the same record. *Id*. ("Reasonable minds reviewing the record might disagree about" what the ultimate issue is for habeas corpus relief.). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Only if the evidence is "too powerful

1   to conclude anything but" the contrary should the district court grant relief.  *Miller-El v. Dretke*, 545

2   U.S. 231, 265 (2005).

3              Under the authorities discussed above, the only issue for review is whether the state

4   appellate court was unreasonable in determining that the prosecutor's stated race-neutral reasons for

5   excusing prospective juror Craig were genuine.  Here, the prosecutor articulated several reasons for

6   excusing Ms. Craig, including (1) her negative impressions of the criminal justice system as a result

7   of her previous experience as a juror in a case in which she felt a guilty defendant was acquitted;;

8   (2) her view that there were innocent people in jail and guilty people on the streets; (3) the arrest of

9   her nephew several years prior; and (4) her dissatisfaction in the outcome of the prosecution of her

10  partner in a recent domestic violence case.  These are all permissible, non-discriminatory reasons

11  for exercising peremptory challenges.  *See Mitleider v. Hall*, 391 F.3d 1039, 1048 (9th Cir. 2004)

12  (previous negative experience with law enforcement or the judicial system constitutes an acceptable

13  race-neutral explanation for striking a potential juror); *United States v. Thompson*, 827 F.2d 1254,

14  1260 (9th Cir. 1987) ("Excluding jurors . . . because they acquitted in a prior case, or because of a

15  poor attitude in answer to voir dire questions is wholly within the prosecutor's prerogative.").

16             Having reviewed the record, and in light of the governing deferential standard of

17  review, the state appellate court's determination that the reasons given by the prosecutor for

18  excusing Ms. Craig were not a pretext for racial discrimination cannot be found unreasonable.  The

19  prosecutor expressed reasonable grounds for the use of a peremptory challenge to excuse Ms. Craig,

20  and there is no indication in the record that the reasons were pretextual.  The stated reasons were

21  "clear and reasonably specific", *Purkett*, 514 U.S. at 768-69, as well as race-neutral.  In addition,

22  Petitioner's argument that the prosecutor's allegedly discriminatory motive was demonstrated by

23  her retention of other jurors with similar characteristics to stricken jurors is without merit.  As the

24  state appellate court explained, while the retained jurors possessed some comparable characteristics

25  with prospective juror Craig, there were additional characteristics identified by the prosecutor as

26                                         29

1  grounds for excusal which Craig possessed and the retained jurors did not.

2          Petitioner is not entitled to federal habeas corpus relief on this claim.

3  **C.      PROSECUTORIAL MISCONDUCT**

4          Petitioner claims that multiple acts of prosecutorial misconduct rendered his trial

5  fundamentally unfair.  Specifically, he contends that the prosecutor attempted to dissuade his alibi

6  witness, Tiffany Avent, from testifying, assumed facts not in evidence by questioning her regarding

7  whether her husband abused her, and argued that she had not testified at the first trial and thus was

8  likely being forced to provide alibi testimony at the second trial.  In addition, Petitioner argues that

9  the prosecutor committed misconduct during closing arguments by making a personal plea that the

10 jury find Petitioner guilty; discussing the demographics and sociology of the victims, and discussing

11 the sexism experienced by "girls in the hood."

12         The California Court of Appeal, Third Appellate District, considered and rejected

13 Petitioner's claim on direct appeal, explaining its reasoning as follows:

14             Defendant accuses the prosecutor of six different instances of
               misconduct.  He asserts the judgment must be reversed based on a
15             persistent pattern of misconduct.  We disagree.

16             "In general, a prosecutor commits misconduct by the use of deceptive
               or reprehensible methods to persuade either the court or the jury.
17             [Citations.] But the defendant need not show that the prosecutor acted
               in bad faith or with appreciation for the wrongfulness of the conduct,
18             nor is a claim of prosecutorial misconduct defeated by a showing of
               the prosecutor's subjective good faith."  (*People v. Price* (1991) 1
19             Cal.4th 324, 447.)  A prosecutor's conduct violates a defendant's
               constitutional rights only when the pattern of behavior is so egregious
20             it infects the entire trial with such unfairness as to make the
               conviction a denial of due process.  (*People v. Mendoza* (2007) 42
21             Cal.4th 686, 700.)

22             Although a prosecutor's duty to prosecute vigorously allows her to
               strike hard blows, defendant reminds us she "'is not at liberty to
23             strike foul ones.  It is as much [her] duty to refrain from improper
               methods calculated to produce a wrongful conviction as it is to use
24             every legitimate means to bring about a just one.' [Citation.]" (*People
               v. Pitts* (1990) 223 Cal.App.3d 606, 691.)  Yet "'"when the claim [of
25             misconduct] focuses upon comments made by the prosecutor before

26                                              30

the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'" (*People v. Ayala* (2000) 23 Cal.4th 225, 284.)

**Tiffany Avent**

Defendant asserts that the prosecutor attempted to dissuade Tiffany Avent from testifying, assumed facts not in evidence by examining her about an abusive relationship, and informed the jury that she had not testified in the first trial to enable her to argue Avent had been forced to provide alibi testimony. None of defendant's allegations constitute misconduct.

The prosecutor requested the court to appoint counsel for Avent before she testified because there was an allegation she had picked up defendant and Worthington after the shooting, and therefore she might have been an accessory after the fact. Moreover, she was recorded discussing her testimony with her husband, and although she told an investigator she was working on the day of the shooting, her work records revealed she was not. Counsel was appointed, Avent testified, and there was neither any misconduct nor prejudice arising from appointment of counsel.

Defendant objects to the prosecutor's questions of Avent whether her husband had abused her and the prosecutor's statement during closing argument that Avent had not testified at the first trial. Avent appeared at this trial for the first time as an alibi witness for defendant. During her examination, the prosecutor challenged her testimony and asked, "Miss Avent, do you feel compelled to testify as you have today because you're in an abusive relationship with your husband?" Avent testified that the last time her husband was incarcerated it was not because he had abused her and she did not feel compelled to provide defendant an alibi.

The prosecutor argued: "Tiffany Avent; is it consistent with the defendant's testimony? Oh, you bet it is. And I guess that's why she wasn't asked to testify in the first trial. [¶] And what happened? She's talked to the defendant about 15 times. And regardless of whether she's -- realize [*sic*] she's being coached or not, I believe she does, the point now is she is an alibi witness."

The prosecutor is free to challenge a defense witness's [sic] credibility and to urge the jurors to draw inferences from the evidence. "It is not . . . misconduct to ask the jury to believe the prosecutor's version of events as drawn from the evidence. Closing argument in a criminal trial is nothing more than a request, albeit usually lengthy and presented in narrative form, to believe each party's interpretation, proved or logically inferred from the evidence,

31

of the events that led to the trial.  It is not misconduct for a party to make explicit what is implicit in every closing argument, and that is essentially what the prosecutor did here." (*People v. Huggins* (2006) 38 Cal.4th 175, 207.)

The fact remains that defendant presented a new alibi for his second trial.  Avant testified she had only recently come forward and thus it was implicit she had not testified in the first trial.  The prosecutor properly challenged her motivation to testify and properly urged the jury to reject a belated and unlikely alibi.  We would not characterize the prosecutor's examination or argument as misconduct, let alone an egregious pattern of misbehavior that compromised a fair trial.

## Personal Plea

Defendant contends the prosecutor committed misconduct by making a personal plea for a guilty verdict.  The prosecutor argued: "I'm not standing in front of you, nor do I come into court and say to you, convict this man right here solely because he's a gang member.  Because he is a gang member.  And he's a very active gang member.  That's wrong. [¶] I want you to convict because you think he did it.  Because he did do it.  And it's important to me that you tell him that you know that he did it.

Following defense counsel's objection, the trial court told the prosecutor to "please keep the personal out of it" and admonished the jury that "What the attorneys say is not evidence."

A prosecutor can express belief in a defendant's guilt as long as it is based on the evidence and does not suggest to the jury the belief is based on information outside the trial record.  (*People v. Mayfield* 91977) 14 Cal.4th 668, 781-782.)  Taken in context, the prosecutor was urging the jury to convict defendant because he shot the victims, not because he was a member of a gang.  There is no suggestion her belief was based on anything outside the evidence admitted at trial.  Moreover, after her innocuous and brief comment, the trial court promptly admonished the jury.  This argument does not constitute misconduct.

## Demographics and Sociology of Victims

During closing argument, the prosecutor lamented the consequences of the gang subculture including violence, drugs, and a lack of direction.  She found this subculture depressing.  In this context, she made reference to the difference in upbringing between the victims and the defendant.  While pointing out that this week's victims could become next week's perpetrators and vice versa, she mentioned: "But the Canadys are kids from a much different upbringing than Mr. Jackson.  That much is clear.  They are kids from the hood.  Young

people. They are much more ghetto in their upbringing. Less opportunities. [¶] And there are parts of this case that are very depressing, and that's one of 'em. Because they don't always or haven't always choosen [*sic*] that lifestyle or that [*sic*] a continuation of what they were raised in, unlike this man who chose it. Who didn't get sucked in. He chose it."

Defendant contends that evidence of the relative circumstances of the two families was not admitted at trial and therefore the prosecutor committed misconduct by introducing facts during argument. (*People v. Pinholster* (1992) 1 Cal.4th 865, 948.) In a recorded conversation, defendant bragged about choosing a gang lifestyle. Moreover, the prosecutor may simply have been asking the jurors to infer a difference between the gangster victims and the gangster defendant. More importantly, the prosecutor's isolated comment, even if based on evidence not before the jury, was unlikely to influence the jury. After all, the sociology of the gang subculture pervaded this trial and slight gradations between those who were "born into the hood" and those who volitionally chose it would have had little impact in deciding whether defendant was the shooter. This is not the kind of egregious misconduct that would necessitate a reversal.

**Girls in the Hood**

In a similar vein, defendant argues the prosecutor again introduced facts not in evidence when she argued there were young females "with no self-esteem getting used and getting passed around in this subculture. And that's depressing. I mean, if you have daughters, that's depressing to know that they can have that low of a self-esteem." She later connected to the theme of defendant [*sic*] by referring to his alleged "slappings [of] Kaydee Wormington" and asserting that "[t]his is a very sexist subculture. Very sexist. There is all the bravado. Bravado, machismo, everything involved in this. She gives me some very specific examples of being abused by Landon Jackson."

Wormington testified that defendant became aggressive, obsessive, jealous, and abusive; called her names like "[b]itch, slut, whore, punk"; and sometimes slapped and choked her. We agree with the Attorney General that the prosecutor's argument was a fair comment on the evidence. Her testimony provided sufficient evidence to infer a sexist subculture.

Lodged Doc. at 30-36.

On habeas corpus review, allegations of prosecutorial misconduct merit relief "only if the misconduct rises to the level of a due process violation–not merely because [the reviewing

1  court] might disapprove of the prosecutor's behavior." *Towery v. Schiriro*, 641 F.3d 300, 306 (9th

2  Cir. 2010) (citing *Seechrest v. Ignacio*, 549 F.3d 789, 807 (9th Cir. 2008). *See also Darden v.*

3  *Wainwright*, 477 U.S. 168, 181 (1986) (for the purposes of federal habeas corpus review, the narrow

4  standard of due process applies to claims of prosecutorial misconduct)  A prosecutor's error or

5  misconduct does not, per se, violate a criminal defendant's constitutional rights. *See Jeffries v.*

6  *Blodgett*, 5 F.3d 1180, 1191 (citing *Darden*, 477 U.S. at 181; *Cambell v. Kincheloe*, 829 F.2d 1453,

7  1457 (9th Cir. 1987)).  Moreover, prosecutors are afforded reasonably wide latitude in fashioning

8  closing arguments, *United States v. Birges*, 723 F.2d 666, 671-72 (9th Cir. 1984), and are free to

9  argue "reasonable inferences from the evidence." *United States v. Gray*, 876 F.2d 1411, 1417 (9th

10 Cir. 1989). "[P]rosecutors may strike 'hard blows,' based upon the testimony and its inferences,

11 although they may not, of course, employ argument which could fairly be characterized as foul or

12 unfair." *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir. 1972).

13         The question to be resolved is whether the alleged misconduct "'so infected the trial

14 with unfairness as to make the resulting conviction a denial of due process.'" *Hall v. Whitley*, 935

15 F.2d 164, 165 (9th Cir. 1991) (quoting *Donnelly v. DeChritoforo*, 416 U.S. 637, 643 (1974)).  In

16 order to determine whether prosecutorial misconduct occurred, it is necessary to examine the entire

17 proceedings and place the prosecutor's conduct in context. *See Greer v. Miller*, 483 U.S. 756, 765-

18 66 (1987).  Factors to be considered in determining whether habeas corpus relief is warranted

19 include whether the prosecutor manipulated or misstated the evidence; whether her comments

20 implicated other specific rights of the accused; whether the objectionable content was invited or

21 provoked by defense counsel's argument; whether the trial court admonished the jurors; and the

22 weight of the evidence against the defendant. *Darden*, 477 U.S. at 181 (quoting *Donnelly v.*

23 *DeChristoforo*, 416 U.S. 637, 643 (1974).  Thus, even where a prosecutor's argument, questions or

24 behavior is found to be improper, relief is limited to cases in which a petitioner can establish that

25 the misconduct resulted in actual prejudice. *Johnson v. Sublett*, 63 F.3d 926, 930 (1995) (citing

26                                              34

1  *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).  In other words, prosecutorial misconduct

2  violates due process when it has a substantial and injurious effect or influence in determining the

3  jury's verdict.  *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996).

4          The state appellate court's rejection of Petitioner's prosecutorial misconduct claims

5  was not contrary to or an unreasonable application of clearly established federal law.  The state

6  court's characterizations of the prosecutor's conduct were reasonable, and for the reasons set forth

7  by the state appellate court, the prosecutor's conduct did not render Petitioner's trial fundamentally

8  unfair in violation of his federal due process rights.

9          Most importantly, even if the prosecutor's conduct amounted to error of a

10  constitutional magnitude, a harmless error analysis ensues.  Here, Petitioner has failed to

11  demonstrate that he suffered actual prejudice as a result of any of the alleged misconduct.  As

12  previously summarized herein, the material evidence and verbal testimony presented against

13  Petitioner at trial was significant.  Thus, viewed in the context of the trial as a whole, it cannot be

14  determined that the Prosecutor's conduct had a substantial and injurious effect or influence on the

15  jury's verdict, or that there is a reasonable probability that the result of his trial would have been

16  different absent the alleged misconduct.

17          Petitioner is not entitled to federal habeas corpus relief on this claim.

18  **D.      CUMULATIVE EFFECT OF STATE LAW ERRORS**

19          Petitioner contends that the cumulative effect of the errors at trial, discussed above,

20  deprived him of his right to due process and rendered his trial fundamentally unfair.  The California

21  Court of Appeal, Third Appellate District, considered and rejected this claim on direct appeal,

22  explaining that "[n]one of the incidents we have addressed come close to the egregious misbehavior

23  that jeopardizes a fair trial."  Lodged Doc. 4 at 36.

24          In some cases, the combined effect of multiple trial errors may give rise to a due

25  process violation if the trial was rendered fundamentally unfair, even where each alleged error

26                                      35

1  considered individually would not require reversal. *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir.

2  2007) (citing *Donnelly v. Dechristoforo*, 416 U.S. 637, 643 (1974); *Chambers v. Mississippi*, 410

3  U.S. 284, 290 (1973)).   The fundamental question in determining whether the combined effect of

4  trial errors violated a defendant's due process rights is whether the errors rendered the criminal

5  defense "far less persuasive," *Chambers*, 410 U.S. at 294, and thereby had a "substantial and

6  injurious effect or influence" on the jury's verdict. *Parle*, 505 F.3d at 927 (quoting *Brecht*, 507 U.S.

7  at 637).

8  　　　　"[C]umulative error analysis should evaluate only the effect of matters determined

9  to be error, not the cumulative effect of non-errors." *United States v. Rivera*, 900 F.2d 1462, 1471

10  (9th Cir. 1990).   If the evidence of guilt is otherwise overwhelming, the errors are considered

11  harmless and the conviction will generally be affirmed. *Parle*, 505 F.3d at 928.   On the other hand,

12  if the government's case on a critical element is weak, the combined effect of the error is more likely

13  to be prejudicial. *Id*.   In this case, the evidence against Petitioner was compelling, as discussed

14  elsewhere herein.   Moreover, as discussed above, Petitioner has suffered no errors of a federal

15  constitutional magnitude.   Thus, there is no combined effect of errors to be reviewed. *United States*

16  *v. Geston*, 299 F.3d 1130, 1138 (9th Cir. 2002) ("Because there is only one error in this case,

17  cumulative error analysis is not triggered."); *United States v. Sager*, 227, F.3d 1138, 1149 (9th Cir.

18  2000) (holding that "[o]ne error is not cumulative error").

19  　　　　　Petitioner is not entitled to federal habeas corpus relief on this claim.

20  　　　　　　　　**VI. CONCLUSION**

21  　　　　IT IS RECOMMENDED that Petitioner's petition for writ of habeas corpus be

22  denied.   These findings and recommendations are submitted to the United States District Judge

23  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).   Within twenty-one days

24  after being served with these findings and recommendations, any party may file written objections

25  with the court and serve a copy on all parties.   Such a document should be captioned "Objections

26  　　　　　　　　　　　　　　　　36

to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within seven days after service of the objections. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991). In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: August 31, 2011

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

37